# United States District Court
# District of Massachusetts

UNITED STATES OF AMERICA

    v.                        CRIMINAL NO. 2001-10118-JLT

LUIS DE LA CRUZ

## *REPORT AND RECOMMENDATION ON PETITIONER'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255 (#411) AND PETITIONER'S MOTION FOR RELIEF FROM JUDGMENT IN LIGHT OF THE GOVERNMENT'S FRAUD ON THE COURT PURSUANT TO FED. R. CIV. PROC. RULE 60(b)(3) (#423)*

COLLINGS, U.S.M.J.

## I. Introduction

Luis De La Cruz ("De La Cruz" or "the petitioner") was convicted after a two-week jury trial on one count of conspiracy to possess with intent to distribute one kilogram or more of heroin, 21 U.S.C. § 846, and one count of possession with intent to distribute and distribution of heroin, 21 U.S.C. § 841(a)(1).  He was sentenced on February 14, 2006 to 240 months in prison followed by 60 months of supervised release.  His conviction was affirmed on direct appeal.  *United States v. De La Cruz*, 514 F.3d 121 (1 Cir., 2008), *cert. denied*, 129 S. Ct. 2858 (2009).

De La Cruz has filed a Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (#411), raising some eleven challenges to his conviction.  In addition, he has filed an Affidavit and Sworn Statement in Support of 28 U.S.C. § 2255 (#412), an exhibit (#419), and a Supplemental Motion to Amend His 28 U.S.C. § 2255 to Add an Additional Ground [Ground XII]  Pursuant to Fed. R. Civ. P. 15(a)(1)(A) (#422), which this Court granted on March 10, 2010.  Also pending before the Court is De La Cruz's Motion for Relief from Judgment in Light of the Government's Fraud on the Court

Pursuant to Fed. R. Civ. Proc. Rule 60(b)(3) (#423).[1] De La Cruz also filed a Delayed Motion for an Evidentiary Hearing in His 28 U.S.C. § 2255 Proceeding (#429). The government has filed its responses under seal (##425-427, 430). On April 19, 2010, De La Cruz filed Petitioner's Reply to Government's Opposition to Petition and Supplemental Petition under 28 U.S.C. § 2255, and Motion for Relief from Judgment (#436), and a Second Affidavit and Sworn Statement in Support of 28 U.S.C. § 2255 Motion (#437). At this juncture, the briefing is complete and the motions are ripe for disposition.

## II. Factual Background

The Court derives the following factual background from the First Circuit's opinion affirming De La Cruz's conviction.

Beginning in 1999 until he was arrested on March 22, 2001, De La Cruz ran a drug distribution operation in and around Lawrence, Massachusetts. On March 8, 2001, De La Cruz sold twenty-five bundles[2] of heroin to Alison Tracy ("Tracy"), one of his regular customers. The bundles were distributed in

---

[1] On January 14, 2010, the Petitioner's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (#411) was referred to the undersigned for a Report and Recommendation; on March 10, 2010, the Motion for Relief from Judgment (#423) was referred to the undersigned for a Report and Recommendation.

[2] Ten small baggies of heroin grouped together constitutes a "bundle."

plastic sandwich bags and marked either with black eagles or blue stars. That same day, Tracy also bought twenty-five bundles of heroin from another dealer, Richard Frias, also known as "Miguel." These bundles contained baggies that were marked with red beetles and blue dolphins. Tracy, in turn, sold eight bundles to one of her customers, Jesse Flynn ("Flynn"): four were marked with blue stars and black eagles, and four were marked with blue dolphins. The next day, March 9, Flynn sold two bundles of heroin to his childhood friend, Bryan Wallace ("Wallace"): one contained baggies marked with blue stars and the other contained baggies marked with black eagles.

The following day, March 10, Wallace's girlfriend found Wallace dead in his home. The police found eleven empty baggies--some marked with black eagles and some marked with blue stars--in Wallace's home; they also found seven unopened baggies marked with blue stars. The baggies and the drug paraphernalia found in Wallace's home tested positive for heroin.

The police investigation ultimately led to De La Cruz's arrest on March 22, 2001. On April 4, 2001, De La Cruz was charged by indictment with one count of conspiracy to possess with intent to distribute heroin, under 21 U.S.C. § 846. Subsequently, a three-count superseding indictment was returned on October 24, 2002, adding a substantive distribution count under 21 U.S.C. §

4

841, and an aiding and abetting count under 18 U.S.C. § 2. All three counts alleged that the offense resulted in the death of Bryan Wallace.

A second superseding indictment was returned on December 8, 2004, containing a section 846 conspiracy count and a section 841 substantive offense count. Both counts alleged that the offense resulted in the death of Bryan Wallace. In addition, the indictment alleged that De La Cruz was accountable for at least 1 kilogram, but not more than 3 kilograms, of heroin; that De La Cruz was the supervisor or manager of a criminal enterprise that involved at least five participants; and that death and serious bodily injury resulted from the use of the heroin distributed by De La Cruz.

After a two-week jury trial, which commenced on April 25, 2005, a jury found De La Cruz guilty of the two offenses charged in the second superseding indictment. In addition, the jury found, among other things, that the conspiracy involved one kilogram or more of a substance containing heroin, that heroin was a but-for cause of Wallace's death, and that the heroin distributed as part of the conspiracy caused Wallace's death. Likewise, on the substantive count, the jury found that the ingestion of heroin was a but-for cause of Wallace's death, and that the heroin that caused Wallace's death had passed through De La Cruz's hands.

On February 14, 2006, the district court sentenced De La Cruz to twenty years in prison, followed by five years of supervised release. The twenty-year sentence reflects the statutory mandatory minimum under 21 U.S.C. § 841(b)(1)(A), where a death results. The First Circuit rejected eight claims of error raised on direct appeal, and affirmed the judgment of conviction. It also affirmed the district court's denial of De La Cruz's motion for a new trial. *See De La Cruz*, 514 F.3d at 141.

## III. Discussion

## A. Overview of claims presented

De La Cruz advances the following claims (some with sub-parts set out more fully in the discussion of the individual claims), either in his original petition (#411), his Supplemental Motion to Amend (#422), or in his motion for relief from judgment (#423): 1) trial counsel was constitutionally ineffective for failing to pursue an insanity or diminished capacity defense (Ground I); 2) trial counsel was ineffective in failing to move for dismissal of the second superseding indictment before trial (Ground II); 3) the Sixth Amendment Confrontation Clause was violated when the government called Dr. Alexander Chirkov ("Dr. Chirkov"), who performed Wallace's autopsy, to testify at the grand jury proceedings, but failed to call Dr. Chirkov at trial

(Ground III); 4) the Sixth Amendment Confrontation Clause was violated when the government's expert witness recited during his testimony the results of a blood test performed on Wallace, where the expert had not performed the test himself (Ground IV); 5) the Sixth Amendment right to a fair trial was violated when the trial court failed to instruct the jury on determining the drug quantities "reasonably foreseeable" to the defendant (Ground V); 6) the evidence did not support the conclusion that De La Cruz's distribution of heroin caused Wallace's death (Ground VI); 7) trial counsel was ineffective in advancing a defense based on the similarities of the packages seized from Roberto Herrara ("Herrara"), a runner for Miguel, and those found in Wallace's house, and in failing to rebut with expert testimony the government's expert's testimony about the purity of the heroin (Ground VII); 8) trial counsel was ineffective in failing to investigate "synergism" as the cause of Wallace's death (Ground VIII); 9) the Sixth Amendment Confrontation Clause was violated when the government's expert was permitted to testify based on an autopsy report that he did not himself perform (Ground IX); 10) the statutory minimum sentence imposed is unconstitutional under *United States v. Booker*, 543 U.S. 220 (2005), and *Kimbrough v. United States*, 552 U.S. 85 (2007) (Ground X); 11) relief from judgment under Fed. R. Civ. P. 60(b) is warranted

because the government committed fraud on the court when it a) failed to disclose its intention to elicit testimony from its chemist about the purity of the heroin; when it b) used a cooperating witness's contradictory statements at trial; and when it c) failed to disclose certain Bates numbers (Ground XI).

In addition to these eleven claims, the Court granted De La Cruz's motion to amend his petition to add the following claim:  trial counsel was constitutionally ineffective for failing to challenge the indictment on double jeopardy grounds (Ground XII).

## B. Governing legal principles

The government contends that Grounds V, VI and VII (in part) were fully adjudicated in De La Cruz's direct appeal, and that, therefore, De La Cruz cannot re-litigate his claims in this Court.  The government further argues that Ground II (in part), Ground VIII (in part) and Ground X (in toto) are procedurally defaulted because De La Cruz could have raised them in his direct appeal, but did not.  The government maintains that the remaining Sixth Amendment ineffective-assistance-of-counsel claims lack merit.  After setting out the governing legal principles, the Court considers the claims *seriatim*.

### 1. *The mandate rule bars re-adjudication of claims on collateral review*

"Claims that previously have been addressed on direct review . . . may

not be readjudicated collaterally under § 2255 absent equitable considerations, such as actual innocence or cause and prejudice." *Conley v. United States*, 323 F.3d 7, 22 (1 Cir., 2003); *see also United States v. Chityal*, 673 F. Supp.2d 59, 68 (D. Mass., 2009). This principle is related to the "mandate rule," a branch of the law of the case doctrine, which "prevents relitigation in the trial court of matters that were explicitly or implicitly decided by an earlier appellate decision in the same case." *United States v. Wallace*, 573 F.3d 82, 88 (1 Cir.) (citation omitted), *cert. denied*, 130 S. Ct. 657 (2009). And, under the mandate rule, a district court is required to follow a previous ruling of the court of appeals. A defendant must demonstrate "exceptional circumstances" to avoid the mandate rule, where it governs, to wit, "a change in controlling legal authority, significant new evidence not earlier obtainable with due diligence, or the prospect of a serious injustice." *Id.* at 89 (citing *United States v. Bell*, 988 F.2d 247, 251 (1993)).

## 2. *Procedurally defaulted claims may not be considered on collateral review*

"Collateral relief in a § 2255 proceeding is generally unavailable if the petitioner has procedurally defaulted his claim by 'fail[ing] to raise [the] claim in a timely manner at trial or on [direct] appeal.'" *Bucci v. United States*, 662 F.3d 18, 27 (1 Cir., 2011) (quoting *Berthoff v. United States*, 308 F.3d 124,

127-28 (1 Cir., 2002) (alteration in original). So, if De La Cruz has procedurally defaulted certain of his claims by failing to raise them on direct review, "collateral review under § 2255 will be available only if the petitioner can show both (1) 'cause' for having procedurally defaulted his claim; and (2) 'actual prejudice' resulting from the alleged error." *Id.* (quoting *United States v. Frady*, 456 U.S. 152, 167-68 (1982)). The notable exception to this rule is an assertion of ineffective assistance of counsel, which "may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." *Massaro v. United States*, 538 U.S. 500, 504 (2003). Thus, "ineffective assistance of counsel can constitute cause sufficient to excuse a procedural default, but only if the representation was 'constitutionally ineffective under the standard established in *Strickland* [*v. Washington,* 466 U.S. 668, 688 (1984).]'" *Bucci*, 662 F.3d at 29 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).

### 3. Standard for establishing Sixth Amendment ineffective assistance of counsel

By virtue of the Sixth Amendment, every defendant in a criminal prosecution has the right to effective assistance of counsel. U.S. Const. Amend. VI; *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). In order to

establish a deprivation of the right, a defendant must meet the now-familiar two-prong test set out in *Strickland v. Washington*, 466 U.S. 668 (1984). The defendant must establish (1) that "counsel's performance was deficient" which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) that "the deficient performance prejudiced the defense," which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. The First Circuit has recently summarized the guiding principles:

> 'Surmounting *Strickland*'s high bar is never an easy task.' *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010). Judicial scrutiny of the defense counsel's performance is 'highly deferential,' and the defendant must overcome a 'strong presumption . . . that, under the circumstances, the challenged action might be considered sound trial strategy.' *Strickland*, 466 U.S. at 689. The inquiry focuses on 'the objective reasonableness of counsel's performance, not counsel's subjective state of mind.' *Harrington v. Richter*, 131 S. Ct. 770, 790 (2011) . . . . The reviewing court is therefore 'required not simply to give [the] attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did.' *Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011) . . . .

*Bucci*, 662 F.3d at 30 (further citations and internal quotation marks omitted)

(alterations in original).

## C. The Claims

### 1. Trial counsel was constitutionally ineffective for
### failing to pursue an insanity or diminished capacity defense (Ground I)

De La Cruz faults his trial counsel for failing to investigate and assert an

insanity defense at trial. (#411 at 9) A defendant, by "clear and convincing

evidence," bears the burden of proving an insanity defense. 18 U.S.C. § 17(b).

The insanity defense is defined as

> an affirmative defense to a prosecution under any
> Federal statute that, at the time of the commission of
> the acts constituting the offense, the defendant, as a
> result of a severe mental disease or defect, was unable
> to appreciate the nature and quality or the
> wrongfulness of his acts. Mental disease or defect
> does not otherwise constitute a defense.

18 U.S.C. § 17(a). As the *Strickland* standard pertains to the present case,

"[t]he choice whether to pursue an insanity or diminished capacity defense

turns in part on defense counsel's choice of strategy, and for obvious reasons

counsel's strategy judgments are ordinarily given special deference." *Robidoux*

*v. O'Brien*, 643 F.3d 334, 338 (1 Cir.), *cert. denied sub nom.*, *Robidoux v.*

*Murphy*, 132 S. Ct. 866 (2011). To establish prejudice in this context, a

petitioner "must show . . . that there is a 'reasonable probability' that he would

have prevailed on his insanity defense had he pursued it." *Knowles v. Mirzayance*, 546 U.S. 111, __, 129 S. Ct. 1411, 1422 (2009).

De La Cruz has first failed to establish that "counsel's representation fell below an objective standard of reasonableness" as required by the first prong of *Strickland.* 466 U.S. at 688. De La Cruz asserts that trial counsel made no attempt to investigate the possibility of an insanity defense, even though De La Cruz informed him "that he was taking psychotic [sic] medications and that he had a history of psychiatric hospitalizations." (#411 at 9) De La Cruz also states that he asked trial counsel to talk with his Department of Social Services worker "in order to submit mitigating evidence as to Petitioner's background for trial purposes." (#411 at 9) However, counsel's decision to pursue or not to pursue an insanity defense is a strategic decision, and De La Cruz has failed to provide persuasive evidence as to why counsel should have been compelled to investigate an insanity defense; this is an entirely different inquiry than whether De La Cruz might have been entitled to a downward departure at sentencing based on his psychological history (a tack that his counsel did pursue). *Cf. Bucci*, 662 F.3d at 31 ("A competent defense counsel is 'entitled to formulate a strategy that [is] reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.'") (quoting

*Harrison v. Richter*, 131 S. Ct. 770, 789) (2011) (alteration in original). Trial counsel's decision not to pursue an insanity defense is a presumed "strategy judgment[]," and this Court is not persuaded that Petitioner has overcome that presumption. *Robidoux*, 643 F.3d at 338.

Even assuming *arguendo* that trial counsel's performance "fell below an objective standard of reasonableness," De La Cruz nevertheless has still failed to satisfy the prejudice prong of *Strickland*. De La Cruz merely states in conclusory fashion that counsel's failures materially prejudiced him. Petitioner must prove something more, i.e., that there was a "reasonable probability" that he would have prevailed on an insanity defense. In other words, there must have been a reasonable probability that a jury would have believed that De La Cruz did not appreciate the wrongfulness of dealing drugs. In his Second Affidavit, De La Cruz avers that he "did know [selling drugs] was against the law," but states that he "did not see anything wrong" with breaking that law. (#437 at 1) De La Cruz's own statements that he knew his actions were against the law strongly cut against an argument that the insanity defense would have been reasonably probable to succeed. De La Cruz also relies heavily on a psychological report prepared for the sentencing phase; however, this report does not provide "clear and convincing" evidence that De La Cruz

did not understand he was selling drugs or that he did not appreciate the wrongfulness of selling drugs. Indeed, in the Court's view, nothing in the report aids De La Cruz in his assertion that he might have prevailed if his counsel had asserted an insanity defense.

### 2. Trial counsel was ineffective in failing to move for dismissal of the second superseding indictment before trial (Ground II, part 1); Petitioner's speedy trial rights were violated (Ground II, part 2)

In Ground II of his habeas petition, De La Cruz argues that 1) his trial counsel was constitutionally ineffective in failing to move to dismiss the second superseding indictment before trial and 2) that his speedy trial rights were violated. The First Circuit considered and rejected part 2 of this claim on direct appeal, concluding that although the defendant had expressly reserved his right to dismiss the second superseding indictment on speedy trial grounds, the defendant waived that right by failing to move for dismissal prior to trial. *See De La Cruz*, 514 F.3d at 129 (citing 18 U.S.C. § 3162(a)(2)). In his petition, De La Cruz now faults his trial counsel for failing to pursue a Speedy Trial Act ("STA") claim. The viability of Ground II necessarily reduces to the question whether De La Cruz's trial counsel was constitutionally ineffective in failing to assert an STA violation. *See supra* Part III(B)(3). The Court thus analyzes De La Cruz's contention that his counsel was ineffective in failing to move to

dismiss the superseding indictments.

*a. Facts underlying the claim*

De La Cruz was arrested on March 22, 2001. The criminal complaint charged De La Cruz with conspiring to possess with intent to distribute a quantity of heroin, in violation of 21 U.S.C. § 846. De La Cruz was indicted on that conspiracy charge on April 4, 2001. (*See* #13) Neither the criminal complaint nor the indictment contained an allegation that the conspiracy resulted in Wallace's death. *See De La Cruz*, 514 F.3d at 127. De La Cruz was arraigned on this indictment on April 20, 2001.

A three-count superseding indictment was returned on October 24, 2002, adding a substantive distribution count under 21 U.S.C. § 841, and an aiding and abetting count under 18 U.S.C. § 2. All three counts alleged that the offense resulted in the death of Bryan Wallace. (*See* #107) De La Cruz was arraigned on this indictment on November 7, 2002. A second superseding indictment was returned on December 8, 2004. (#188) The second superseding indictment expanded the dates of the conspiracy, and added notice of additional sentencing factors, including drug quantity, role in the offense and death and serious bodily injury resulting.

On January 6, 2005, defense counsel filed an Emergency Motion seeking

to go to trial on the first superseding indictment. (#217) In that motion, defense counsel reserved the "right to bring a motion to dismiss the second Superseding Indictment." (#217 at 2 n.2) The district court denied the motion that day. In De La Cruz's direct appeal, the First Circuit rejected an STA claim, concluding that De La Cruz had waived the claim. *De La Cruz*, 514 F.3d at 129.

### b. *Ineffective assistance in failing to move to dismiss second superseding indictment*

De La Cruz argues that his trial counsel was ineffective in failing to move to dismiss both the second superseding indictment and the superseding indictment on STA grounds. He contends that his counsel could have moved to dismiss the second superseding indictment because it failed to comply with the thirty-day arrest-to-indictment provision of the STA. In order to establish that his counsel was constitutionally ineffective, De La Cruz must establish that a reasonably competent attorney would have moved to dismiss the indictments; and he must further establish that the results of the proceedings would have been different. This claim fails on both prongs.

According to De La Cruz, the original criminal complaint alleged Wallace's overdose death, and so the original indictment, which was returned

on April 4, 2001, should have alleged that De La Cruz was responsible for Wallace's death. Because it did not, De La Cruz contends that the superseding indictment violated the thirty-day arrest-to-indictment provision of the STA, which states: "Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested . . . in connection with such charges." 18 U.S.C. § 3161(b). De La Cruz argues that "[h]aving failed to include the overdose death of [Bryan] Wallace in the original indictment, [the STA] requires dismissal of the first & second superseding indictment for [alleging] identical allegations as in the original complaint." (#411 at 18)

The problem with this argument, as the government points out, is that the criminal complaint (#1), which was dated March 23, 2001, did *not* allege that De La Cruz was responsible for Wallace's overdose death. The criminal complaint charged De La Cruz with conspiracy to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The original indictment was brought on April 4, 2001, well within thirty days of the initial complaint, and it reflected the identical crime charged in the initial complaint. Thus, the government was not required to allege Wallace's overdose death in the original indictment, and the original indictment was not subject to dismissal, as De La Cruz contends.

*Cf. United States v. Martinez*, 268 F. Supp.2d 70, 72 (D. Mass., 2003) (where original indictment is "on all fours" with the criminal complaint--i.e., the indictment does not add a distinct offense--there is no speedy trial issue).

The government alleged for the first time that the offense resulted in Wallace's death in the superseding indictment, which was returned on October 24, 2002. De La Cruz's real argument is that the government knew that it intended to charge De La Cruz with the aggravated penalty at the time of the criminal complaint (as evidenced by the affidavit offered in support of the complaint), but that it delayed formally charging De La Cruz with the aggravated offense until October 24, 2002. But these circumstances do not establish an STA violation: "Th[e] . . . superseding indictment was permissible . . . because the First Circuit has made clear that under the Speedy Trial Act, the government can file new charges outside the 30-day limit that are not contained in the original complaint: 'the statute says nothing about barring the institution of a new charge for a different offense based on some or all of the underlying transaction.'" *United States v. Worthy*, 755 F. Supp.2d 226, 230 (D. Me., 2010) (quoting *United States v. Grullon*, 545 F.3d 93, 97 (1 Cir., 2008)). In other words, the STA does not require that all charges be filed within the first thirty days after a defendant's arrest, as De La Cruz appears to

argue, despite an indication in the supporting affidavit that the government possessed the information to charge him with the overdose death. *See id.* at 231 (rejecting this argument and noting that "the First Circuit has made clear that, in comparing complaints and indictments, it is the *charge* that matters, not the facts underlying the charge") (citing *Grullon*, 545 F.3d at 97) (footnote omitted). And there is no question that the "death resulting" charge constituted a new charge for purposes of the STA. *See id.* at 230-31 (noting that under *Apprendi v. New Jersey*, "any fact that increases the maximum authorized statutory sentence 'is the functional equivalent of an element of a greater offense,' which must be charged in an indictment and proved beyond a reasonable doubt") (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).[3] For these reasons, defense counsel did not render constitutionally ineffective assistance in failing to raise a meritless claim.[4]

---

[3]

De La Cruz's reliance on *United States v. Martinez*, 268 F. Supp.2d 70 (D. Mass., 2003), is misplaced. In *Martinez*, Judge Gertner dismissed without prejudice a superseding indictment which charged the defendant with distributing drugs resulting in serious bodily injury. There, the complaint *had* made the identical allegations, and so a Speedy Trial Act violation occurred because the superseding indictment had not been brought within the thirty days required under the act.

[4]

The Court does not read De La Cruz's petition to be arguing that the seventy-day indictment to trial requirement was violated here. *See* 18 U.S.C. § 3161(c)(1) (requiring that defendant be brought to trial no more than seventy days after the return of an indictment or the defendant's first appearance before an judicial officer). In any event, De La Cruz would be required to establish more than a period of delay in order to establish an STA violation, and he has not done so here. *See United States v. Vega Molina*, 407 F.3d 511, 532 (1 Cir., 2005) ("[E]ighteen months is a considerable period of delay. But that delay is not, in and of itself, sufficient to establish a Speedy Trial Act transgression.").

De La Cruz's ineffective assistance of counsel claim fails for at least two other reasons. In this case, "[e]ven if reasonably competent counsel under the 'prevailing professional norms'" had recognized a possible STA violation, "under the applicable objective standard, competent counsel could have knowingly and reasonably declined to raise the . . . issue . . . because doing so would be a waste of the defense's time, energy, and resources." *Bucci*, 662 F.3d at 31. Here, there is no reason to believe that an STA violation (assuming one occurred) would not have led to a dismissal of the indictment without prejudice. *Cf. Martinez*, 268 F. Supp.2d at 74-75 (noting factors court considers in deciding whether to dismiss with or without prejudice for STA transgression, and dismissing without prejudice where seriousness of offense causing "serious bodily injury" weighed strongly against dismissal with prejudice). Because the government would have been entitled to re-indict De La Cruz, defense counsel could reasonably have concluded that it would have been a waste of time to move for dismissal. *Cf. United States v. Rushin*, 642 F.3d 1299, 1304, 1308 (10 Cir., 2011) (noting that "[a] dismissal without prejudice . . . permits the Government to return 'a new indictment . . . within six calendar months of the date of the dismissal' in the event the statute of limitations has run" and concluding that "a reasonable attorney in the sound

exercise of his or her professional judgment arguably might have decided to forgo the filing of a motion to dismiss the indictment as largely ineffective, an imprudent use of limited resources, or even unwarranted gamesmanship") (quoting 18 U.S.C. § 3288).

For similar reasons, De La Cruz cannot establish prejudice. In order to establish prejudice, De La Cruz must show that the results of the proceedings would have been different if his counsel had moved to dismiss the second superseding indictment. Although De La Cruz appears to argue that he would not have been subject to the "death resulting" penalty--which carried a statutory minimum of twenty years--if his counsel had obtained dismissal of both the second superseding indictment and the superseding indictment on STA grounds, that is not so. Again, absent a showing that the indictment would have been subject to dismissal with prejudice, counsel could not have avoided the "death resulting" penalty by seeking dismissal. *See Rushin*, 642 F.3d at 1310 & n.12 (noting that at least four additional federal circuits had concluded that "where an indictment would have been dismissed without prejudice, a defendant could not show prejudice based upon trial counsel's failure to seek dismissal under the STA," and collecting cases).

For these reasons, the Court concludes that Ground II lacks merit.

### 3. The Sixth Amendment's Confrontation Clause was violated when the government failed to produce Dr. Chirkov, who conducted Wallace's autopsy, at trial (Ground III); when Dr. Andrew recited the results of blood tests performed on Wallace (Ground IV); and when Dr. Andrew testified to his expert opinion as to the cause of death based on autopsy and toxicology reports that he did not perform (Ground IX)

De La Cruz raises three claims based on the Sixth Amendment's Confrontation Clause.  In Ground III, De La Cruz contends that the Sixth Amendment Confrontation Clause was violated because the government failed to produce the medical examiner,  Dr. Chirkov, who performed Wallace's autopsy, to testify at trial.  Although Dr. Chirkov testified at the grand jury proceedings about the cause of Wallace's death, at trial the government did not call Dr. Chirkov, but instead called Dr. Thomas Andrew.  In Ground IV, De La Cruz asserts that his Sixth Amendment confrontation rights were violated when Dr. Andrew testified about the results of a test of Wallace's blood which Dr. Andrew did not himself perform.  Finally, in Ground IX, De La Cruz contends that his Sixth Amendment rights were violated when Dr. Andrew rendered an expert opinion on the cause of Wallace's death, based on an autopsy report and blood tests that were not introduced into evidence and that had been performed by other non-testifying analysts.  Because the claims are closely related, the Court considers them together.

The government contends, among other things, that the claims are barred as having been fully litigated on direct appeal. (#427 at 14)[5] Applying *Crawford v. Washington*, 541 U.S. 36 (2004), the First Circuit rejected variations of these claims in De La Cruz's direct appeal. Ordinarily, the mandate rule would preclude reopening the issue. Here, however, De La Cruz relies on *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527 (2009), which, as the government notes, was decided while De La Cruz's petition for a writ of certiorari was pending.[6] An exception to the mandate rule permits De La Cruz to "show that controlling legal authority has changed dramatically." *Bell*, 988 F.2d at 251. *See also supra* Part III(B)(1). In short, in order to reopen consideration of this issue, this Court would have to conclude that *Melendez-Diaz* would have altered the First Circuit's resolution of the issue here. Through this narrow lens, the Court considers the claims of

---

[5]

The First Circuit addressed the Confrontation Clause claims presented on appeal on the merits, even though it deemed them inadequately developed. *See De La Cruz*, 514 F.3d at 133.

[6]

*Melendez-Diaz* was decided on June 25, 2009, and the Supreme Court denied certiorari in De La Cruz's case four days later on June 29, 2009. Because De La Cruz's case was pending before *Melendez-Diaz* issued, non-retroactivity principles are inapplicable and De La Cruz receives the benefit of any new law announced in *Melendez-Diaz*. *See Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987) (defining finality for purposes of applying new constitutional rules).

Conversely, De La Cruz does not receive the benefit of any new rule announced in *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011), because the Supreme Court has not made *Bullcoming* retroactive to cases on collateral review.

Sixth Amendment error.

In analyzing the claim under *Crawford*, the First Circuit described the relevant facts as follows:

Dr. Thomas A. Andrew, M.D. ('Dr. Andrew'), Chief Medical Examiner for the State of New Hampshire, testified as an expert regarding the cause of Wallace's death. Dr. Andrew did not himself perform the autopsy on Wallace's body or conduct any toxicological tests or investigate at the scene where Wallace's body was found. In forming his opinion as to the cause of death, Dr. Andrew instead relied on police reports, crime scene photographs, and autopsy and toxicology reports, all of which were prepared by other individuals. Dr. Andrew explained that such materials are routinely relied on by experts in his field. Dr. Andrew also explained that autopsies are required by law in cases involving sudden, unexpected, or violent deaths, that autopsy reports contain objective fact-only descriptions of the observations made by the examining physician at the time of the autopsy, and that autopsy reports are intended to provide a permanent record of findings relevant to the cause of death.

Defendant objected to Dr. Andrew's testimony on Confrontation Clause grounds. Citing *Crawford*, Defendant argued that the autopsy report upon which Dr. Andrew relied constituted testimonial evidence prepared by someone whom Defendant could not cross-examine. The district court overruled Defendant's objection at trial, holding that Dr. Andrew's testimony was not based on testimonial hearsay but was, instead, properly based on his review

of a record, the preparation of which was required by law. For the same reasons, the district court on remand found that Defendant's *Crawford* argument did not entitle him to a new trial.

*De La Cruz*, 514 F.3d at 132-33.

In rejecting De La Cruz's claim that Dr. Andrew's testimony violated the Sixth Amendment, the First Circuit concluded:

An autopsy report is made in the ordinary course of business by a medical examiner who is required by law to memorialize what he or she saw and did during an autopsy. An autopsy report thus involves, in principal part, a careful and contemporaneous reporting of a series of steps taken and facts found by a medical examiner during an autopsy. Such a report is, we conclude, in the nature of a business record, and business records are expressly excluded from the reach of *Crawford*.

*De La Cruz*, 514 F.3d at 133 (citing *Crawford*, 541 U.S. at 56).

In this case, De La Cruz attacks Dr. Andrew's reliance on the autopsy and toxicology reports, claiming that those reports are themselves testimonial in nature, and contending that *Melendez-Diaz* would require the government to produce the authors of those reports. *Melendez-Diaz* explicitly called into question one aspect of the First Circuit's decision, *viz.*, that the autopsy report or the toxicology reports, as so-called "business records," would have been

beyond *Crawford*'s reach.  The Court stated:

> As we stated in *Crawford*: 'Most of the hearsay
> exceptions covered statements that by their nature
> were not testimonial--for example, business records or
> statements in furtherance of a conspiracy.  Business
> and public records are generally admissible absent
> confrontation not because they qualify under an
> exception to the hearsay rules, but because--having
> been created for the administration of an entity's
> affairs and not for the purpose of establishing or
> proving some fact at trial--they are not testimonial.
> Whether or not they qualify as business or official
> records, the analysts' statements here--prepared
> specifically for use at petitioner's trial--were testimony
> against petitioner, and the analysts were subject to
> confrontation under the Sixth Amendment.

*Melendez-Diaz*, 557 U.S. at __, 129 S. Ct. at 2539-40.

But putting aside the conclusion in *De La Cruz* that autopsy reports are exempt

from the strictures of the Confrontation Clause because of their status as

"business records," the question remains whether the result in this case would

be different under *Melendez-Diaz*.   For the following reasons, the Court

concludes that it would not.

    *Melendez-Diaz* examined whether affidavits (or "certificates of analyses")

which reported the results of a drug analysis and which were admitted into

evidence at trial violated the Confrontation Clause.  The Court concluded that

they did because they were "testimonial" in nature:  the affiants were therefore

"witnesses" subject to the defendant's right of confrontation. The Court noted that *Crawford* described "the class of testimonial statements covered by the Confrontation Clause" as including, among other things, "material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [and] . . . statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 2531 (quoting *Crawford*, 541 U.S. at 51-52).

An argument could be made (and De La Cruz makes it, *see* #411 at 21) that the autopsy report is indeed "testimonial" in nature under *Melendez-Diaz*. *See, e.g., Nardi v. Pepe*, 662 F.3d 107, 111-112 (1 Cir., 2011) (noting that *De La Cruz* "treated [autopsy] reports as not covered by the Confrontation Clause," and noting that "even now it is uncertain whether, under its primary purpose test, the Supreme Court would classify autopsy reports as testimonial") (citing *De La Cruz*, 514 F.3d at 133-34).[7] Here, however, unlike in *Melendez-*

---

[7]     Although the facts in *Nardi v. Pepe*, 662 F.3d 107 (1 Cir., 2011), are similar to those here (an expert relying on an autopsy report that he did not perform), the standard of review involved in *Nardi* renders *Nardi* of limited guidance in this case, other than to underscore the unsettled nature of the question presented: *Nardi* involved review of a petition presented under 28 U.S.C. § 2254, and the question presented was whether *Crawford* "clearly established" that the Confrontation Clause barred the expert opinion which was based in

*Diaz*, the autopsy report itself and the underlying toxicology reports were not admitted into evidence. Rather, the question is whether a Confrontation Clause issue arose when Dr. Andrew based his expert opinion on those reports or when he recited the results of those reports during his testimony. This is an entirely different question than the one presented in *Melendez-Diaz*, and one which the Supreme Court has not yet resolved. (As De La Cruz has pointed out (*see* #498 Motion for Bail/Release), the Supreme Court has granted certiorari review to consider the extent to which an expert can rely on such out-of-court statements. *See People v. Williams*, 238 Ill.2d 125, 345 Ill.Dec. 425, 939 N.E.2d 268 (Ill. 2010), *cert. granted sub nom. Williams v. Illinois*, No. 10-8505, 131 S. Ct. 3090 (2011)).

Recently, however, the First Circuit has had occasion to consider the evolution of Confrontation Clause doctrine as it concerns "the extent to which the Sixth Amendment permits an expert witness to disclose the substance of a previously *unadmitted* forensic lab report that he did not draft." *United States v. Ramos-González*, 664 F.3d 1, 5 (1 Cir., 2011). *Ramos-González* concluded that, absent further clarification from the Supreme Court, "the assessment is one of degree. Where an expert witness employs her training and experience

---

part on the autopsy report. *Nardi* held that it had not.

to forge an independent conclusion, albeit on the basis of inadmissible evidence, the likelihood of a Sixth Amendment infraction is minimal." *Id.* Indeed, *Ramos-González* cited *De La Cruz* for the proposition that "the Confrontation Clause does not limit experts offering their own opinion regardless of the independent admissibility of the material relied upon." *Ramos-González*, 664 F.3d at 5. However, "[w]here an expert acts merely as a well-credentialed conduit for testimonial hearsay . . . her testimony violates a criminal defendant's right to confrontation." *Id.* (collecting cases).

For the sake of thoroughness, the Court has re-examined Dr. Andrew's testimony in light of *Melendez-Diaz*, and the Court concludes that Dr. Andrew's testimony does not offend the Confrontation Clause as it had been interpreted by the time of *Melendez-Diaz*. Dr. Andrew did not "simply parrot[] the conclusion" of the autopsy report. *Id.* at 6. Dr. Andrew testified that he relied on police records, photographs of the scene of the death, and the autopsy report in forming his opinion that Wallace had died of an overdose of opiates. He noted, among other things, that a photograph of Wallace's body taken at the scene showed "the presence of a small plume of pink-tinged foam coming from Wallace's mouth." (#324, Tr. VII: 54). He testified that the plume of foam was consistent with "pulmonary edema" and that "pulmonary edema with

30

a foam cone . . . is a classic, not constant but classic, finding with certain drug overdoses and opiate drugs in specific." (*Id.* at 56). Dr. Andrew further testified that he independently reviewed tissue samples taken from Wallace's heart and lungs. (*Id.* at 57-58) He noted that the autopsy report showed that Wallace's lungs weighed about twice what he would expect to find in a person of Wallace's size and age, that Wallace's heart was enlarged, and that his bladder was "quite distended." (*Id.* at 63) Dr. Andrew testified that these three elements in the autopsy report "correlate[d] with the things that were evident at the scene." (*Id.* at 63-64). In short, Dr. Andrew did not simply recite the conclusions of the report in rendering his opinion that Wallace had died of "an acute opiate intoxication."[8] He concluded:

> The totality of the case made that the most likely and most obvious cause of death. The history, in terms of the scene and what was gathered from the police reports, suggested that drugs may have been involved. The appearance of the body at the scene suggested drugs may have been involved. He wasn't pulled from a body of water, for example, and drowning could be ruled out fairly easily. And the autopsy was consistent with that, in that he had pulmonary edema, an enlarged bladder full of dilute urine, and no other natural disease or injury to explain the sudden death.

---

[8] For this reason, Ground III fails: the government was not obliged to produce Dr. Chirkov because the government did not introduce his grand jury testimony or the autopsy report into evidence.

(*Id.* at 75)

For much the same reason, the Court concludes that Dr. Andrew's recitation of the blood test results showing high levels of morphine in Wallace's blood (Ground IV), did not violate the Confrontation Clause. Even assuming that it did present a Confrontation Clause issue, as refined by *Melendez-Diaz*, the Court would conclude that any Sixth Amendment error was harmless beyond a reasonable doubt. As noted, Dr. Andrew testified that he relied on several additional sources in concluding that Wallace had died of a heroine overdose. *Cf. Ramos-González*, 664 F.3d at 6-7 (noting factors to consider in determining harmlessness of constitutional error, including whether testimonial statement was cumulative).

### 4. The Sixth Amendment right to a fair trial was violated when the trial court failed to instruct the jury on determining the drug quantities "reasonably foreseeable" to the defendant (Ground V)

The claim asserted in Ground V is barred by the mandate rule. *See supra* Part III(B)(1). The First Circuit considered the claim "that the jury should have been instructed to make an individualized finding as to the drug amounts attributable to or foreseeable by Defendant," and rejected it as meritless. *De La Cruz*, 514 F.3d at 137. De La Cruz concedes as much. (*See* #411 at 30)

### 5. Whether the evidence supported the

*conviction for "death resulting" to Wallace and
whether Wallace's death was reasonably foreseeable (Ground VI)*

The issues presented in Ground VI are also barred by the mandate rule because the First Circuit considered them on direct appeal and determined that they lacked merit. *See De La Cruz*, 514 F.3d at 137 ("Nothing in the language of the statute suggests that a death must be foreseeable before the enhanced penalty provision applies."); *see also id.* at 141 ("Here, the record amply demonstrates that the jury's verdicts were supported by overwhelming evidence.").

### 6. Trial counsel was ineffective 1) in advancing a defense based on the similarities of the packages seized from Roberto Herrara and those found in Wallace's house, and 2) in failing to rebut with expert testimony the government's expert's testimony about the purity of the heroin. (Ground VII)

In Ground VII, De La Cruz asserts that his trial counsel rendered constitutionally ineffective assistance of counsel in advancing a defense theory that ultimately proved unsuccessful. He also contends that his counsel was ineffective in failing to offer expert testimony to counter the government's evidence on the purity of the heroin found in Wallace's room.

*a. Underlying Facts*

As previously noted, on March 9, 2001, Wallace's childhood friend,

Flynn, sold Wallace two bundles of heroin, one bundle containing baggies marked with blue stars and one bundle containing baggies marked with black eagles. *De La Cruz*, 514 F.3d at 126. When the police discovered Wallace's body, they found eleven torn and empty baggies, some of which were marked with black eagles and some of which were marked with blue stars.

Flynn was arrested on March 20, 2001. He told investigators that he had bought the heroin from Tracy. The police interviewed Tracy, who was already in custody. Tracy placed controlled calls to her two suppliers, the defendant and Miguel. Tracy's cooperation led to the defendant's arrest and to the arrest of Roberto Herrara ("Herrara"), who was a runner for Miguel. When he was arrested, Herrara had in his possession ten bundles of heroin, some marked with black eagles and some with blue stars, the same markings that were found on the empty baggies in Wallace's house.

At trial, defense counsel advanced a theory of defense "based on the similarities in the baggie markings used by [De La Cruz] and Miguel. He maintained that because [De La Cruz] and Miguel both--at times--distributed baggies marked with blue stars and black eagles, the jury could have concluded that Miguel, and not [De La Cruz], supplied the heroin on which Wallace overdosed." *De La Cruz*, 514 F.3d at 131.

At trial, the government's chemist, Stacy Turner ("Turner"), testified that the heroin seized from Herrara tested about thirty-seven percent pure, while the heroin taken from Wallace's house was of much higher purity. Defense counsel objected to the testimony because the government had not informed him prior to trial that Turner would testify about the purity of the heroin samples. After Turner was excused, defense counsel moved for a mistrial, complaining that "Turner's purity testimony had 'ship-wrecked' his defense," *id.* at 131, which had depended on the similarities of the markings on the baggies sold by De La Cruz and Herrara. The district court denied the motion for mistrial.

*b. Analysis*

Any claim that defense counsel was ineffective in failing to offer expert testimony to rebut Turner's testimony regarding the purity of the heroin fails. First, a variation of this claim was considered and rejected by Judge Tauro, *see United States v. De La Cruz*, No. 01-cr-10118, 2007 WL 2579631, at *4 (D. Mass., Aug. 30, 2007) (rejecting claim that counsel was ineffective in failing to "adequately develop the various degrees of purity of heroin found at the decedent's house and seized from Roberto Herrara") (internal quotation marks

omitted), and affirmed on direct appeal, *see De La Cruz*, 514 F.3d at 140. Second, the government agreed that it would not use the testimony on purity to argue that the heroin found in Wallace's home was different from the heroin seized from Herrara two weeks later. The trial judge noted that a limiting instruction would serve only to draw attention to the testimony. Defense counsel could have decided, as a matter of strategy, that calling a rebuttal expert would have served only to emphasize Turner's testimony. De La Cruz has not overcome the presumption that the challenged action might be considered counsel's sound trial strategy.

In addition, the First Circuit rejected the ineffectiveness claim on direct appeal based on a failure to establish prejudice. Expert rebuttal testimony would have done nothing to answer the "overwhelming" evidence that Wallace died as a result of the heroin sold by De La Cruz. *See id.* at 141. That evidence consisted of the live testimony linking the heroin ingested by Wallace to De La Cruz. *Id.* The First Circuit continued: "In contrast, there was no evidence to suggest that, during the relevant time period, anyone other than Defendant sold Tracy heroin baggies marked with blue stars and black eagles. Consequently, even if counsel had not 'ship-wrecked' Defendant's theory of defense by his alleged deficient performance, we find no reasonable probability

that the outcome of the trial would have been different." *Id.* This aspect of the claim has thus already been decided and is barred.

### *7. Trial counsel was ineffective in failing to investigate "synergism" as the cause of Wallace's death (Ground VIII)*

De La Cruz contends that habeas relief is warranted because his trial counsel failed to investigate "synergism" as the cause of Wallace's death. De La Cruz posits that Wallace's death resulted from the interaction of two or more drugs--the suggestion is that the heroin distributed by De La Cruz was not the sole cause of death.

De La Cruz has failed to establish a reasonable probability that the results of the trial would have been different if defense counsel had pursued this line of inquiry. The First Circuit noted that "the evidence was overwhelming that Wallace died as a result of heroin that was distributed by Defendant." *De La Cruz*, 514 F.3d at 141. It is not enough to speculate, as De La Cruz does, that "synergism" caused Wallace's death.

To be sure, the government's medical examiner testified that Wallace "occasionally used ketamine," (#324, Tr. VII: 73), an amphetamine-like drug also called angel-dust (*id.* at 76), and that he considered whether "ketamine played a causative or contributory role in [Wallace's] death, or if the death was

due solely to the opiates that were measured," (*id.* at 73). Nevertheless, Dr. Andrew testified that the presence of ketamine in Wallace's blood did not change his opinion that heroin caused Wallace's death. Specifically, Dr. Andrew testified that "the ketamine yielded fairly insignificant levels," and "it wouldn't have been inconsistent with just carryover if that same pipe were used previously to abuse ketamine and then subsequently used for the heroin. They weren't levels that were significant enough for me to opine or conclude that the ketamine was contributory or causative in his death." (*Id.* at 76)

In support of his claim, De La Cruz has offered a few articles that describe "synergism." Beyond speculation, he has offered nothing that suggests either that his counsel was ineffective in failing to pursue this vague theory, or that the theory had any possibility of altering the result.

### 8. *Mandatory minimum sentence petitioner received is unconstitutional under United States v. Booker, 543 U.S. 220 (2005) (Ground X)*

De La Cruz contends that the twenty-year statutory minimum to which he was sentenced is unconstitutional under *United States v. Booker*, 543 U.S. 220 (2005), and *Kimbrough v. United States*, 552 U.S. 85 (2007). The government correctly argues that this claim is procedurally defaulted because De La Cruz could have asserted it on direct appeal but did not. Even if it were

not defaulted, the claim lacks merit. *See, e.g., United States v. Fanfan,* 558 F.3d 105, 110 n.6 (1 Cir.) (following *Booker* and *Kimbrough*, sentencing courts must still follow mandatory minimums imposed by statute), *cert. denied*, 130 S. Ct. 99 (2009).

### 9. The government committed fraud on the court (Ground XI)

In Ground XI of his petition, De La Cruz asserts that relief is warranted because the government committed fraud when: 1) it failed to disclose its intention to elicit testimony from its chemist about the purity of the heroin; 2) it used Elison Anziani's (a cooperating witness's) contradictory statements at trial; and 3) it failed to disclose certain Bates numbers during discovery. De La Cruz asserts that his trial and appellate counsel were constitutionally ineffective in failing to bring a Rule 60(b)(3) motion to challenge the government's actions. De La Cruz also raises these very claims in greater detail in his Motion for Relief from Judgment (#423).

To the extent that De La Cruz argues that his trial and appellate counsel were ineffective in failing to pursue a Rule 60(b) motion, this claim fails because the rule does not offer relief from a criminal conviction.[9] The correct

---

[9]

In any event, Rule 60(b) "may not be used as a back-door substitute for an omitted appeal . . . ." *Cotto v. United States*, 993 F.2d 274, 278 (1 Cir., 1993).

vehicles to challenge a conviction are a motion for a new trial, pursuant to Fed. R. Crim. P. 33, or a petition for habeas corpus. De La Cruz's trial attorney did pursue a motion for a new trial based on the claim that the defense did not receive proper notice from the government that its expert witness would testify about the purity of the heroin. The district court rejected the claim, *see De La Cruz*, 2007 WL 2579631, at \*\*1-2, and that decision was affirmed on appeal, *De La Cruz*, 514 F.3d at 129-32. Significantly, both decisions determined that Turner's testimony was cumulative. This claim is therefore barred under the mandate rule.

Similarly, De La Cruz's complaint about the government's use of Anziani's testimony fails. De La Cruz claims that "the government knew that Anziani had lied prior to putting him on the stand." (#423 at 11) But the record shows that De La Cruz's trial counsel also moved for a new trial on the basis of a post-conviction letter written by Anziani; counsel claimed that the letter established that Anziani had lied at trial. The district court rejected the claim that a new trial was warranted based on the contents of the letter, and this conclusion was affirmed on appeal. *See De La Cruz*, 514 F.3d at 134-36. Significantly, the First Circuit found (as did the district court) that the letter was not exculpatory, and that "the government's case against Defendant was so strong

that even if the jury discredited Anziani's testimony in its entirety, Defendant would still have been convicted." *Id.* at 135. These findings on the question of prejudice necessarily doom any suggestion that De La Cruz's counsel was ineffective in failing to frame this claim as a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *See, e.g., United States v. Celestin*, 612 F.3d 14, 22 (1 Cir., 2010) (to establish *Brady* violation, a defendant must show, *inter alia*, that "prejudice ensued from the suppression (i.e., the suppressed evidence was material to guilt or punishment)") (internal quotation marks and citation omitted).

Finally, De La Cruz claims that the government's failure to disclose certain Bates numbers amounted to a *Brady* violation. This claim is procedurally defaulted. To the extent that De La Cruz attributes the default to his trial and appellate counsel, this argument fails because De La Cruz has not established actual prejudice resulting from the alleged error. Although De La Cruz speculates that the Bates numbers contained favorable evidence, this speculation is insufficient to establish actual prejudice.

### 10. Trial counsel was ineffective in failing to challenge the indictment on double jeopardy grounds (Ground XII)

De La Cruz claims that his trial counsel was ineffective in failing to

challenge the second superseding indictment on double jeopardy grounds.  He contends that Counts I and II subjected him to multiple punishments for the same offense because both counts charged De La Cruz with Wallace's overdose death and he was sentenced to concurrent twenty-year sentences on the two counts.  This claim must fail because the underlying claim is meritless.

Count I charged De La Cruz with a violation of 21 U.S.C. § 846, conspiracy to possess with intent to distribute heroin.  Count II charged De La Cruz with the substantive offense of possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a).  In addition, both counts alleged that the offense resulted in Wallace's death.  (*See* #188)  To determine whether the two counts amounted to cumulative punishment under the Double Jeopardy Clause, "[t]he applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."  *Blockburger v. United States*, 284 U.S. 299, 304 (1932).  The government correctly notes that "a substantive crime and a conspiracy to commit that crime are not the 'same offence' for double jeopardy purposes."  *United States v. Felix*, 503 U.S. 378, 389 (1992); *see also United States v. Fornia-Castillo*, 408 F.3d 52, 69 (1 Cir.,

2005) (noting that violations of sections 841(a) and 846 are separate offenses for purposes of Double Jeopardy Clause). This effectively ends the matter: adding the allegation that Wallace's death resulted--a separate element in each offense--does not alter the analysis. *Cf. United States v. Marino*, 277 F.3d 11, 39 (1 Cir.) ("The Supreme Court has long recognized that 'in most cases separate sentences can be imposed for the conspiracy to do an act and for the subsequent accomplishment of that end.'") (quoting *Iannelli v. United States*, 420 U.S. 770, 777-78 (1975)), *cert. denied*, 536 U.S. 948 (2002). Counsel could not have been ineffective in failing to raise a meritless claim.

## IV. Recommendation

For all the above reasons, I RECOMMEND that the Petitioner's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (#411), be DENIED. I FURTHER RECOMMEND that the Motion for Relief from Judgment in Light of the Government's Fraud on the Court Pursuant to Fed. R. Civ. Proc. Rule 60(b)(3) (#423), be DENIED. Additionally, I RECOMMEND that all other pending motions be DENIED.

## V. Review by the District Judge

The parties are hereby advised that any party who objects to these recommendations must file a specific written objection thereto with the Clerk

of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1 Cir., 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

*/s/ Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

February 21, 2012.